**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

RONALD MIGUEL WATSON,                )
                                                             )
      Plaintiff,                          )
                                                             )
      v.                                         )    Case No. 5:21-cv-00483-ACA-NAD
                                                             )
LT. JONES, et al.,                            )
                                                             )
      Defendants.                      )

## REPORT AND RECOMMENDATION

Plaintiff Ronald Miguel Watson filed a *pro se* amended complaint pursuant to

42 U.S.C. § 1983, alleging excessive force in violation of the Eighth Amendment[1]

while he was incarcerated at the Limestone Correctional Facility.[2]  Doc. 13 at 3, 7.

Plaintiff Watson names as Defendants Lieutenant Michael Jones, Sergeant Jeremy

S. Pelzer, Officer Michael Fergus Dyett,[3] "Warden Designee" James Smith, and

Officer Alex Andrews.  Doc. 13 at 1–4; *see* Doc. 23 at 2.

Watson alleges that, on February 25, 2021, Defendants Dyett, Andrews,

---

[1] While Watson also lists claims for "corruption, fraud, treason, poor living conditions, [and] unconstitutional demands," pursuant to the Eighth and Fourteenth Amendments (Doc. 13 at 3), his complaint does not include any factual allegations regarding those hypothetical claims.

[2] Watson since has been transferred to the Donaldson Correctional Facility.  *See* Doc. 27.

[3] According to Dyett's affidavit, his name is "Michael Fergus-Dyett."  Doc. 23-3 at 1.

1

Jones, and Pelzer used excessive force while escorting Watson from the visitation video kiosk to his cell, in his cell, and then outside his cell. Doc. 13 at 5–8. With respect to Defendant Smith, Watson alleges only that Smith did the "dirty work" for Warden Streeter. Doc. 13 at 11. Watson seeks money damages. Doc. 13 at 7.

Consistent with the usual practices of this court and 28 U.S.C. § 636(b)(1), this matter was referred to the undersigned for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991); N.D. Ala. Local Rule 72.1. For the reasons stated below, the court should grant Defendant Smith's motion for summary judgment (Doc. 25), and deny Defendants Dyett, Andrews Jones, and Pelzer's motion for summary judgment (Doc. 23) on Watson's claims against them in their individual capacities only.

## BACKGROUND

### A.     Factual background

#### 1.     Undisputed record facts

The parties agree on the following facts: On February 25, 2021, Defendant Officer Dyett escorted Plaintiff Watson from the visitation video kiosk to his cell. Doc. 13 at 5; Doc. 23 at 4; Doc. 25 at 3. Watson was handcuffed at the time. Doc. 13 at 5; Doc. 23 at 4; Doc. 25 at 3. As Dyett was escorting Watson back to his cell, a physical altercation occurred, and—after Watson and Dyett had arrived inside Watson's cell—other officers responded to assist Dyett. Doc. 13 at 5–6; Doc. 23 at

2

5–6; Doc. 25 at 3.

Watson then was removed from his cell, and another physical altercation occurred; Watson was pepper sprayed and taken to the ground. Doc. 13 at 6; Doc. 23 at 6; Doc. 25 at 3. Watson then was escorted to the healthcare unit (HCU) for decontamination and a medical examination. Doc. 13 at 6; Doc. 23 at 7; Doc. 25 at 3.

### 2.    Facts according to Watson's sworn complaint

In his sworn complaint, Watson alleges the following facts: On February 25, 2021, Defendant Officer Dyett "violently attacked" Watson, after "getting [Watson] off of the visitation video machine." Doc. 13 at 5. Dyett "punch[ed] and kick[ed] [Watson] repeatedly." Doc. 13 at 7. Dyett continued his attack "until the code for assistance was called from the cubicle and the other officers arrived" at Watson's cell.[4] Doc. 13 at 5–6.

---

[4] In an unsworn written statement that Watson provided on the day of the incident (February 25, 2021), Watson stated that Dyett had told him to pass out ice and juice to the other inmates. Doc. 23-1 at 6. Dyett then went into the cubicle. Doc. 23-1 at 6. About an hour later, Dyett came back to "lock [Watson] down," but Watson "had a handful of people's money and asked [Dyett] could [Watson] just give the people their money." Doc. 23-1 at 6. Instead, Dyett grabbed Watson's handcuffs and pulled Watson toward his cell. Doc. 23-1 at 6. Dyett entered Watson's cell as if to uncuff Watson, but instead "swung on" Watson. Doc. 23-1 at 6. Dyett then tripped on the cell toilet, causing him to fall onto the bed, and pulling Watson along with him, since Dyett still was holding Watson's handcuffs. Doc. 23-1 at 6. Watson's testimony at his disciplinary hearing was consistent with this unsworn version of the incident. *See* Doc. 23-8 at 3.

Defendants Officer Andrews, Lieutenant Jones, and Sergeant Pelzer, along with "several other officers," led Watson from his upstairs cell to the dorm lobby. Doc. 13 at 6. Andrews was holding Watson's right arm and Jones was holding his left. Doc. 13 at 6.

In the dorm lobby, Andrews warned Jones to "watch out," Jones stepped aside, and Andrews then "pepper sprayed [Watson] for no apparent reason while [he] was still restrained in handcuffs." Doc. 13 at 6.[5]

Watson then was "slammed down to the ground facedown onto [his] stomach," and Pelzer pepper sprayed him again. Doc. 13 at 6. Pelzer then "reached inside of his jacket, pulled a flashlight from his utility belt, [and] retrieved a black handgun." Doc. 13 at 6. Pelzer turned on the flashlight, and asked Watson, "Do you see this boy?" Doc. 13 at 6. Defendant Jones then said, "if you move I will grant him permission to blow your brains out!"[6]  Doc. 13 at 6. Andrews and Jones also

---

[5] According to a use of force report, Watson reported that Andrews attempted to spray him, but instead sprayed non-party Sergeant Everett Gilbert. Doc. 23-7 at 3. But Watson also reported that Andrews sprayed the back of Watson's neck. Doc. 23-7 at 3. The use of force report noted that Gilbert "stated that he was not sprayed at any time." Doc. 23-7 at 6.

[6] The use of force report noted that Watson previously had stated that Andrews "ordered him to get on the ground and he did." Doc. 23-7 at 3. Watson reported further that Andrews then placed his knee on Watson's neck, and that Pelzer pepper sprayed him. Doc. 23-7 at 3. Watson reported that another officer, whom Watson did not know, turned on a "Maglite" flashlight and told him, "If you move, I'll blow yo[ur] brains out." Doc. 23-7 at 3. "Watson stated that the officer was holding a black object, but [Watson] did not know if it was a gun." Doc. 23-7.

"took turns spraying [Watson] while [he] was 'restrained to the fullest' while Sgt. Pelzer held a gun to [his] head." Doc. 13 at 8.

Other officers arrived, helped Watson up, and took him to the HCU for decontamination and a body chart. Doc. 13 at 6.

Although Watson received a body chart at the HCU, he alleges that "the body chart was forged," and that no photographs were taken of his injuries in the HCU, as Alabama Department of Corrections regulations require whenever force is used against an inmate.[7] Doc. 13 at 6.

Watson avers that he sustained "a busted upper lip, pepper spray to [his] face and upper torso, as well as bruises to [his] head." Doc. 13 at 7. Watson complained "several times" to Warden Streeter about this incident, but Streeter "always hides his hand, and allow[ed] his designee [Defendant] Smith to do his dirty work." Doc. 13 at 11.

### 3. Facts according to Defendants' sworn responses and non-party officers' statements

Defendants dispute many of Watson's allegations. In a sworn affidavit, Defendant Dyett avers the following: On February 25, 2021, Dyett observed Watson sitting at a video monitor kiosk while Dyett was performing his duties as floor

---

[7] Photographs of Watson's injuries appear in the records submitted by Defendants. Doc. 23-9. The photographs are consistent with the injuries described in the body chart.

officer.  Doc. 23-3 at 1.  Dyett "began to escort [Watson] to his assigned cell"; and, while Dyett was escorting Watson, "Watson pulled away from [Dyett]," "ran up the stairwell," and "began opening random cells in an attempt to pass contraband."  Doc. 23-3 at 1.  Dyett ordered Watson to stop and to return to his cell.  Doc. 23-3 at 1; *see* Doc. 23-1 at 3.  When Watson tried to run past Dyett, Dyett "grabbed [Watson] by the handcuffs and escorted him to his cell."  Doc. 23-3 at 1.  Once inside the cell, Watson became aggressive, resisted, and pushed Dyett.[8]  Doc. 23-3 at 1.  Dyett "took [Watson] to the ground and held him down until assistance arrived."[9]  Doc. 23-3 at 1.

Non-party Officer Stephens allegedly saw Watson attack Dyett, and wrote an unsworn witness statement on February 25, 2021.  In his statement, Stephens reported that he called a "Code Blue," and that non-party Officer Wallace then assisted Dyett with restraining Watson.  Doc. 23-1 at 4.

Defendant Andrews also submitted a sworn affidavit.  Doc. 23-4.  In his affidavit, Andrews avers as follows:  On February 25, 2021, Andrews responded to

---

[8] According to the use of force report, Dyett explained that he slipped at the threshold of the cell door and fell into Watson's cell.  Doc. 23-7 at 4.  While Watson and Dyett were on the floor, Watson tried to pull away from Dyett, but Dyett maintained his hold on Watson's handcuffs until other officers arrived.  Doc. 23-7 at 4.  But Dyett also reported to Jones that Watson assaulted him.  Doc. 23-7 at 5.

[9] The use of force report found that Dyett's use of force against Watson was justified.  Doc. 23-7 at 9.

the code, and found Dyett and Officer Wallace in Watson's cell. Doc. 23-4. Andrews "assisted Officer Wallace in escorting Watson down the stairwell towards the lobby." Doc. 23-4.

At that time, Defendant Jones and non-party Officer Cothrum entered Housing Unit D. Doc. 23-4. Jones "instructed Officer Cothrum and [Andrews] to escort inmate Watson to the Infirmary for a body chart." Doc. 23-4. While Andrews and Cothrum were escorting Watson, Watson "became physically resistant and pulled away from [their] grasp." Doc. 23-4. Consequently, Andrews sprayed Watson in the face with Sabre Red.[10] Doc. 23-4. Watson then was "taken to the ground." Doc. 23-4. At that time, Jones took over escorting Watson to the HCU. Doc. 23-4.

Andrews avers that Defendant Pelzer was not present during this incident. Doc. 23-4.

Defendant Jones also submitted a sworn affidavit. In his affidavit, Jones avers the following: On February 25, 2021, Jones entered Housing Unit D and "observed inmate Watson being escorted towards the lobby area." Doc. 23-1 at 1. Jones instructed the officers escorting Watson to take Watson to the HCU for a medical examination. Doc. 23-1 at 1. Jones then went to ensure that Dyett was not injured.

---

[10] The use of force report found that Andrews' use of chemical agent spray (Sabre Red) on Watson was justified. Doc. 23-7 at 9.

Doc. 23-1 at 1.

When Jones exited Unit D, he saw Watson "lying face down on the ground outside [the] Housing Unit." Doc. 23-1 at 1. Watson, who had been sprayed with a chemical agent, "was kicking and screaming at the Officers." Doc. 23-1 at 1. Jones ordered Watson to stop resisting. Doc. 23-1 at 1. "Watson complied and all force ceased." Doc. 23-1 at 1. Jones and Officer Cothrum helped Watson to his feet and took him to the HCU for decontamination and a body chart. Doc. 23-1 at 1.

Jones avers that Defendant Pelzer was not present during this incident. Doc. 23-1 at 2. Similarly, the incident report does not reflect that Pelzer was present. Doc. 23-5.

Defendant Pelzer also submitted a sworn affidavit. In his affidavit, Pelzer avers that he "had no involvement" with the incident that occurred on February 25, 2021. Doc. 23-2. Pelzer avers that "the only involvement [he] had with Watson was a Disciplinary Hearing that was held on March 17, 2021."[11] Doc. 23-2.

After that disciplinary hearing, Pelzer found Watson guilty of assaulting Dyett and refusing to obey multiple direct orders to return to his cell. Doc. 23-8 at 3, 17. Defendant Smith approved the disciplinary hearing findings. Doc. 23-8 at 8, 18.

---

[11] The disciplinary reports reflect that Watson was charged with assaulting Dyett and refusing to obey a direct order. Doc. 23-8 at 2, 12.

### 4.    Other record facts

After the February 25, 2021 incident, a use of force investigation was initiated, and a use of force report was issued.  *See* Doc. 23-7.  According to the use of force report, Watson reported that Dyett had instructed him to distribute ice and juice to the inmates in the dorm, and that Watson refused to do so.[12]  Doc. 23-7 at 2.  Watson also said that, for the next hour and a half, Watson had gone from cell to cell talking to other inmates.[13]  Doc. 23-7 at 2.  Watson reported that, when Dyett returned an hour and a half later, he grabbed Watson "by the handcuffs with both hands," and "went to yankin' on [Watson]," after learning that Watson had not distributed the ice and juice.  Doc. 23-7 at 2.

Watson denied pulling away from Dyett, stating instead that he was backing away from Dyett while they went up the steps, and as Dyett was asking, "You ain't done my ice and juice?"  Doc. 23-7 at 2.  Watson stated that, as he backed into his cell, Dyett pushed him.  Doc. 23-7 at 2.  Once inside his cell, Dyett tripped over the toilet and fell.  Doc. 23-7 at 2.  Watson reported that Dyett "would not let go o[f]

---

[12] According to the use of force report, Jones stated that at the HCU "Watson claimed that he was supposed to be passing out ice and juice, [but Dyett] would not let him." Doc. 23-7 at 5.  But Jones also stated that inmates in the restrictive housing unit are not assigned to pass out ice and juice, and that he "has not known [Dyett] to let inmates do that." Doc. 23-7 at 5.

[13] In the use of force report, Watson provided several versions of where he was during that hour and a half. Doc. 23-7 at 2.

[Watson's] handcuffs, so [Watson] fell on top of" Dyett.  Doc. 23-7 at 2–3.  When Officer Wallace arrived, Watson asked for help getting up, so that Dyett would not hit him.  Doc. 23-1 at 6; Doc. 23-7 at 3.  Watson reported that Wallace lifted him off Dyett and sat him down on the bed.  Doc. 23-7 at 3.  Watson also reported that Dyett then "kicked around" Wallace, and kicked Watson in the face.  Doc. 23-7 at 3.  Watson provided a similar version of the incident in his disciplinary hearing.  Doc. 23-8 at 3.

The body chart reflects Watson's eyes were "red and bloodshot," that his upper lip was "slightly swollen," and that he had a "scant amount of dried blood" above his lip.  Doc. 23-1 at 5.

## B.    Legal background

### 1.    Excessive force under the Eighth Amendment

Under the Eighth Amendment,[14] "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (quotation marks omitted).  "What is necessary to establish an 'unnecessary and wanton infliction of pain' . . . varies according to the nature of the alleged constitutional

---

[14] *See, e.g.*, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764 & n.12 (2010); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (stating that, with a few exceptions, the United States Supreme Court "has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States").

violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley*, 475 U.S. at 320).

In the context of a custodial excessive force claim, "corrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." *Id.* at 6 (citations omitted). And, "officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Id.*

For instance, the use of force generally is justified where it is "necessary to restore order." *See, e.g.*, *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990); *accord Pearson v. Taylor*, 665 F. App'x 858, 864 (11th Cir. 2016) ("In general, prison officials are authorized to use force when a prisoner repeatedly fails to obey an order . . . Officers are not required to convince every prisoner that their orders are reasonable . . . before resorting to force." (citations omitted)).

Regardless, on a custodial excessive force claim, the "core judicial inquiry" is the same: "[W]henever prison officials stand accused of using excessive physical force," the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *see also Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (similar).

The United States Supreme Court has articulated factors for "determining whether the use of force" in the custodial context "was wanton and unnecessary." *Hudson*, 503 U.S. at 7; *see also Whitley*, 475 U.S. at 319 ("the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment").

Those factors include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

Also, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Id*. (quoting *Whitley*, 475 U.S. at 321). "The extent of injury may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). So, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson*, 503 U.S. at 7.

In addition, the U.S. Supreme Court has instructed that "courts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the *alleged wrongdoing* was objectively 'harmful enough' to establish a constitutional violation." *Id.* at 8 (citation and quotation marks omitted;

12

alteration in original; emphasis added).  In this regard, the Supreme Court has referred to a "subjective" and "objective" component of a custodial excessive force claim.  *Id.* ("the subjective aspect of an Eighth Amendment claim . . . can be distinguished from the objective facet of the same claim").

For the subjective component, a court should be mindful of the prison officials' point of view based on the facts known at the time, and should "give a wide range of deference to prison officials acting to preserve discipline and security." *Sears*, 922 F.3d at 1205 (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)).  A court should recognize that "corrections officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance" (*Hudson*, 503 U.S. at 6 (citations omitted)), but that deference "does not insulate from review actions taken in bad faith or for no legitimate purpose" (*Whitley*, 475 U.S. at 322).

For the objective component, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson*, 503 U.S. at 9 (citation omitted); *see Johnson v. Glick*, 481 F. 2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

"The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical

force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9 (citations and quotation marks omitted); *see Wilkins*, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citations and quotation marks omitted)).

But, regardless "whether or not significant injury is evident," "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.*

As the Supreme Court has explained, "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 37. "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.*

### 2.    Qualified immunity

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

14

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) (quoting *Lane v. Franks*, 573 U.S. 228, 243 (2014)). In order to receive the protection of qualified immunity, a government official first must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

To show that an official who acted within the scope of his discretionary authority is not entitled to qualified immunity, a plaintiff must establish that both "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (citation omitted). A court may address these two prongs "in either order." *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020).

For a right to be clearly established, a plaintiff can either identify case precedents with materially similar facts or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional. *Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019). In other words, the law must give the officer "fair warning" that his conduct is unconstitutional. *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 955 (11th Cir. 2019) (citations omitted). In

15

analyzing qualified immunity, courts focus not only on the state of the law, but on the factual information that the defendant possessed at the time of the alleged violation. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that the qualified immunity analysis "will often require examination of the information possessed by" the defendant official).

### C.   Procedural background

In response to an order for special report (Doc. 14),[15] Defendants Dyett, Andrews, Jones, and Pelzer filed a special report, which they supported with affidavits and exhibits. Doc. 23. Separately, Defendant Smith filed a special report and an affidavit. Doc. 25.

On May 4, 2022, the parties were notified that the court would construe the special reports as summary judgment motions, and Watson was notified that he had the right to respond to the summary judgment motions by filing affidavits or other evidence. Doc. 26. Watson also was advised of the consequences of any failure to respond or comply with Federal Rule of Civil Procedure 56. Doc. 26; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

On June 3, 2022, Watson was allowed additional time to file a response because he had been transferred to a different prison. Doc. 27. But Watson did not file any response to Defendants' summary judgment motions.

---

[15] This case was reassigned to the undersigned on August 31, 2021.

**LEGAL STANDARD**

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts that create a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

In addition, when ruling on a defendant's summary judgment motion, the court must consider any "specific facts" that a *pro se* plaintiff pleaded in his sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir.

17

2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). The court liberally construes a *pro se* pleading. *See, e.g.*, *Jones v. Florida Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (the court should hold a *pro se* pleading to "a less stringent standard than a pleading drafted by an attorney").

Furthermore, the practical reality that a plaintiff's "evidence consists mainly of his own testimony in his verified complaint, sworn response, and sworn affidavit does not preclude a finding that a genuine dispute of material fact exists." *Sears*, 922 F.3d at 1208. And, "[e]ven if his sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial. *Id.* at 1209. When ruling on a summary judgment motion, a court cannot make credibility determinations. *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006).

## DISCUSSION

On Defendants' summary judgment motions, the court should grant Defendant Smith's summary judgment motion, and deny Defendants Dyett, Andrews, Jones, and Pelzer's summary judgment motion with respect to Plaintiff Watson's Eighth Amendment excessive force claims against them in their individual capacities only.

## I.    The court should grant Defendant Smith's summary judgment motion.

The court should grant Defendant Smith's summary judgment motion because there is no genuine dispute as to any material fact for a jury. With respect to Smith,

Watson alleges only that Warden Streeter "allow[ed] his designee [Defendant] Smith to do his dirty work."  Doc. 13 at 11.  The record shows that Smith's only involvement with the relevant incident was Smith's approval of the eventual disciplinary findings against Watson.  Doc. 23-8 at 8, 18.

In addition, there is no record evidence that would support a claim against Smith for supervisory liability.  In the Eleventh Circuit, a defendant's role as a supervisor does not automatically subject him or her to liability for the actions of subordinates through respondeat superior or vicarious liability.  *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014).  Instead, a supervisor may be liable only if the supervisor directly participated in the unconstitutional conduct, or if there is a causal connection between the supervisor's conduct and the alleged constitutional violation.  *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014); *see Henley v. Payne*, 945 F.3d 1320, 1331 (11th Cir. 2019).

A plaintiff can establish such a causal connection in the following circumstances:  a history of widespread abuse puts a responsible supervisor on notice of the need to correct an alleged violation, and he or she fails to do so; a supervisor's improper custom or policy results in deliberate indifference to constitutional rights; or, facts show that a supervisor ordered his or her subordinates to act unlawfully, or knew that they would act unlawfully and failed to stop them.  *Gonzalez v. Reno*, 325 F.3d 1228, 1234–35 (11th Cir. 2003); *see Valdes v. Crosby*, 450 F.3d 1231, 1237

19

(11th Cir. 2006) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).

Here, there is no evidence that Smith directly participated in any of the alleged unconstitutional conduct, and no evidence of any causal connection between Smith's conduct and the alleged constitutional violation. *See Harrison*, 746 F.3d at 1298; *Gonzalez*, 325 F.3d at 1234–35.

## II. The court should deny Defendants Dyett, Andrews, Jones, and Pelzer's summary judgment motion with respect to Watson's Eighth Amendment excessive force claims against them in their individual capacities only.

Because there are genuine disputes of material fact for a jury, the court should deny Defendants Dyett, Andrews, Jones, and Pelzer's summary judgment motion with respect to Watson's Eighth Amendment excessive force claims against them in their individual capacities only.[16] On the record facts, a jury reasonably could find that Defendants Dyett, Andrews, Jones, and/or Pelzer applied force "maliciously and

---

[16] Watson does not specify whether he sues Dyett, Andrews, Jones, and Pelzer in their official and/or individual capacities. *See* Doc. 13 at 14. But Watson cannot state a claim against Defendants in their official capacities because sovereign immunity would bar any such official capacity claims, as Defendants are employees of the Alabama Department of Corrections and thus agents of the state. *See Pennhurst State Sch. & Hosp. v Halderman*, 465 U.S. 89, 100 (1984); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (a suit against a state official in his official capacity is a suit against the state itself); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (the Eleventh Amendment prohibits a suit against the state absent the state's consent to the suit). Consequently, the court should construe Watson's claims as alleged against Defendants only in their individual capacities. *See generally Chandler v. Vansuch*, 2022 WL 1721220, at *2–3 (N.D. Fla. April 6, 2022) (reasoning that, regardless of a *pro se* prisoner plaintiff's specification of the capacity in which a claim is brought, a court must consider the appropriate capacity).

sadistically to cause harm." *Hudson*, 503 U.S. at 7; *see Sears*, 922 F.3d at 1205 (11th Cir. 2019) (similar). In addition, Defendants are not entitled to qualified immunity because—on the record facts—Watson's Eighth Amendment right was clearly established at the time of the alleged violation.

**A.** As explained above, Watson avers first that Dyett "violently" and repeatedly punched, kicked, pushed, and pulled him, while Watson was handcuffed and compliant with orders, and while Dyett was escorting him from the visitation video kiosk back to his cell. Doc. 13 at 5, 7. Watson also avers that Andrews, Jones, and Pelzer removed Watson from his cell and then excessively and unreasonably pepper sprayed and beat him in the dorm lobby. Doc. 13 at 6, 8.

*Dyett.* Contrary to Watson's sworn complaint, Dyett avers that "Watson pulled away from [Dyett]," "ran up the stairwell," and "began opening random cells in an attempt to pass contraband." Doc. 23-3 at 1. Dyett avers further that Watson did not obey his orders, and that when Watson tried to run past Dyett he "grabbed [Watson] by the handcuffs and escorted him to his cell." Doc. 23-3 at 1.

But, among other things, Watson avers that Dyett "punch[ed] and kick[ed] [Watson] repeatedly," even before Watson might have pulled away from him and consequently before there was any need for force at all. Doc. 13 at 7; *see* Doc. 23-7 at 2.

As a result, this is "a classic swearing match, which is the stuff of which jury

21

trials are made." *Sears*, 922 F.3d at 1208. "[W]hen it comes to arguing the merits, [a defendant] should not—may not—rely on his own factual story. Rather, he should—must—accept his opponent's story and convince [the court] that he is nonetheless entitled to prevail as a matter of law." *Patel v. Lanier Cty. Ga.*, 969 F.3d 1173, 1179 n.1 (11th Cir. 2020).

*Andrews.* With respect to Andrews, Watson avers that—while he still was handcuffed and compliant with orders—Andrews "pepper sprayed [Watson] for no apparent reason." Doc. 13 at 6. Watson also avers that he was "slammed down to the ground facedown onto [his] stomach." Doc. 13 at 6. Watson avers further that Andrews "took turns spraying [Watson] while [he] was 'restrained to the fullest' while Sgt. Pelzer held a gun to [his] head." Doc. 13 at 8.

Andrews does not dispute that he pepper sprayed Watson, or that Watson was taken to the ground. Doc. 23-4. Instead, Andrews avers that, while he was escorting Watson to the HCU, Watson "became physically resistant and pulled away." Doc. 23-4.[17]

---

[17] Even if Watson sustained only what one might characterize as a "*de minimis* injury," that alone would not be enough to dismiss Watson's claims. *See, e.g.*, *Wilkins*, 559 U.S. at 37–38 ("Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts.") While Watson must have more than a *de minimis* injury to recover for a mental or emotional injury, he still could recover actual or nominal damages for a constitutional violation that resulted in physical injury. *See Hoever v. Marks*, 993 F.3d 1353, 1361 (11th Cir. 2021) ("As with nominal damages, 'punitive damages may be recovered for constitutional violations without a showing of compensable injury.'" (quoting *Searles v. Van Bebber*, 251

Defendants are correct that, generally speaking, prison officials can use force to restore order, or when a prisoner refuses to comply with orders. *See, e.g.*, *Bennett*, 898 F.2d at 1533; *Pearson*, 665 F. App'x at 864. But, this again is a swearing match between Watson's version of the incident and Andrews'. And, on this summary judgment motion, the court must construe the evidence and all reasonable inferences in Watson's favor. *See Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("when conflicts arise between the facts evidenced by the parties," the court must "credit the nonmoving party's version" (emphasis omitted)). For instance, according to Watson, Andrews pepper sprayed him "for no apparent reason"—while Watson was restrained and complying with orders. Doc. 13 at 6.

*Pelzer.* Watson avers that, while he was handcuffed and compliant with orders, Pelzer pepper sprayed him. Doc. 13 at 6. Watson also avers that Pelzer held a gun to Watson's head during the physical altercation in the dorm lobby, while Andrews and Jones pepper sprayed him. Doc. 13 at 8.

Defendants, including Pelzer, aver that Pelzer was not even present at the time of the relevant incident. Doc. 23-1 at 2; Doc. 23-2; Doc. 23-4; Doc. 23-5. According to Pelzer, "the only involvement [he] had with Watson was a Disciplinary Hearing that was held on March 17, 2021." Doc. 23-2.

But (again), Watson's sworn complaint and Defendants' sworn affidavits

---

F.3d 869, 880 (10th Cir. 2001)).

"pit[] the correctional officers' word against an inmate's." *Rivera v. LeBron*, 824 F. App'x 838, 842 (11th Cir. 2020) (citing *Sears*, 922 F.3d at 1208–09); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage . . . . '[C]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'" (citations omitted)).  At this stage (and given the parties' conflicting versions of the relevant incident), the court cannot assess the credibility of the parties; that would be for a jury.  *See, e.g.*, *Miller*, 458 F.3d at 1256 (even if the court "believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices" (citations omitted)).

*Jones.*  Watson avers that Jones "took turns spraying [Watson] while [he] was 'restrained to the fullest' while Sgt. Pelzer held a gun to [his] head."  Doc. 13 at 8. Watson also avers that Jones escorted him to the dorm lobby, permitted Andrews to pepper spray him "for no apparent reason," and warned him that if he moved he would allow Pelzer to "blow [his] brains out."  Doc. 13 at 6.  Thus, based on Watson's averments, a jury could find that Jones directly participated in the alleged unconstitutional conduct, and/or that he allowed his subordinates to act unlawfully. *See Harrison*, 746 F.3d at 1298; *Gonzalez*, 325 F.3d at 1234–35; *supra* Part I

24

(supervisory liability).

On the other hand, Jones avers that he was not present for any of the alleged violence or pepper spraying, and that "all force ceased" when he arrived.  Doc. 23-1 at 1.

Again, determining which version of the facts is more credible is for a jury, and not a court considering a summary judgment motion.  *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020); *Sears*, 922 F. 3d at 1209.  Here, "the non-movant's evidence is to be accepted for purposes of summary judgment."  *Johnson v. Lang*, 2022 U.S. App LEXIS 19442, at *12 (11th Cir. July 14, 2022) (citing *Mize v. Jefferson Cty. Board of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).

In sum, even if Watson's allegations "turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial.[18]  *Sears*, 922 F.3d at 1209.  As in *Sears*, "We do not know what the true facts are, but we do know that a genuine dispute of material fact exists."  922 F.3d at 1209.

**B.**  With respect to Watson's excessive force claims against Defendants in their individual capacities, Defendants are not entitled to qualified immunity because—on the record facts—Watson's Eighth Amendment right was clearly established at the time of the alleged violation.  Defendants Dyett, Andrews, Jones,

---

[18] While Watson asserts that both "assaults" were caught by the prison video camera system (Doc. 13 at 8), neither Watson nor any of Defendants has submitted photographic or video evidence of the relevant incidents.

25

and Pelzer assert that they are entitled to qualified immunity.  Doc. 23 at 18.  The parties do not dispute that Defendants were acting within their discretionary authority.  *See Kesinger*, 381 F.3d at 1248.  And, as discussed above (*see supra* Part II.A), a reasonable jury could find that Defendants violated Watson's Eighth Amendment right.  *See Townsend*, 601 F.3d at 1158.  Consequently, the question is whether that right was clearly established at the time of the alleged violation.  *See id.*

Here, reviewing the record facts in the light most favorable to Watson (as the court is required to do at this stage), a jury reasonably could find that each of Defendants used unreasonable and excessive force, all while Watson was handcuffed and compliant.  Thus (on Watson's averments), Defendants had "fair warning" that such alleged conduct is unconstitutional.  *Piazza*, 923 F.3d at 955; *see also Pullen v. Osceola Cty.*, 861 F. App'x 284, 290 (11th Cir. 2021) (holding that the use of force "maliciously and sadistically to cause harm" is a clearly established violation of the Eighth Amendment, and that "[t]here is simply no room for a qualified immunity defense when the plaintiff alleges such a violation" (quoting *Skrtich v. Thorton*, 280 F.3d 1295, 1302 (11th Cir. 2002))).  On this summary judgment motion, the record facts suffice for Watson to overcome qualified immunity.

## RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that the court **GRANT** Defendant Smith's summary judgment motion (Doc. 25).

In addition, the undersigned **RECOMMENDS** that the court **DENY** Defendants Dyett, Andrews, Jones, and Pelzer's summary judgment motion (Doc. 23) on Plaintiff Watson's Eighth Amendment claims against them in their individual capacities only.

## NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within **14 days**. The objecting party must identify every objectionable finding of fact and recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendations waives the right to challenge on appeal those same conclusions adopted in the District Judge's order. Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings of fact and recommendations. The District Judge may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may only appeal from a final judgment entered by a District Judge.

**DONE** this January 23, 2023.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE

28